Whenever you are ready. Is it Mr. Smith? Yes, sir. Okay, great. Thank you, sir. May it please court, Matthew Smith for the appellant, Christopher Kirchner, along with my co-counsel, William Biggs. The court plainly erred when it frequently intervened and asked leading and biased questions in addition to having comments of disbelief and stating opinions regarding the answers to those questions. The United States Supreme Court has held due process clauses implicated at the mere appearance of bias. And the Supreme Court also held in N. Ray Murchison the slightest comment, the slightest intimation from a trial judge could unduly prejudice a jury. Now here in this case, you see two different manners in which the trial court manifested a bias. The first manner is directly attacking the defensive strategy or the legal defense of the case. The second manner is inflaming the jury against the defendant. The prime example of category number one is the court's questioning of the defendant, Mr. Kirchner. Now this court has held in United States v. Sines that there is a heightened risk whenever the defendant testifies and the court asks questions that the court could signal to the jury that he doesn't believe the defendant and therefore he must be guilty. And the First Amendment, within the past five years, had a very similar issue in a case called... Sticking with our law, Sines, it seems like it articulates the test to be would there be a confusion of the rule? Yes sir. But disagree if I'm wrong, that's the test. Would a jury not think this is the judge trying to clarify facts but rather this is a judge who's beginning to sound like an advocate? Yes sir. Is that a fair statement? It's a fair statement. With caution and in fact overturn the case on the fact that there are expressions of disbelief, as the court phrased it. Expressions of disbelief. And part of the complexity here, and I know it's hard to object, especially when your objection is aimed at a judge, but I think the Fifth Circuit, as in Sines and other circuits, do still apply the plain error. You accept that here or you don't? No sir, I would say, don't get me wrong, I think we prevail under either standard of review, plain error or structural. But as we stated in our brief, we want to caution the court that in a case of United States v. Nieder in 1999, the Supreme Court did say, and they referenced back to a case called Toomey, a biased tribunal is structural error. It affects the framework of the trial. Now, we understand the prior press of this court. It doesn't appear though in those opinions that there was an attempt to get the court to look at whether or not this was structural. But part of the problem, I mean there are multiple layers here, and I'm not saying either favors both sides, but we have a rule of evidence, 614B, that does permit district judges to question witnesses themselves. So there is a permissivity to it, and there's good reason if there's unclear facts. And then the rule, if I'm not mistaken, says the standard of review will be abuse of discretion. Doesn't say structural. The text of 614, that's if you object, you get an abuse of discretion review. And it really, it does make sense to me that this wouldn't be structural, this would be plain, because if there's a timely objection, one, the judge can stop. And number two, the judge can give an immediate full curative instruction. Whatever I say, whatever the lawyers say, isn't evidence in front of you. Yes, we would just caution the court on that. I understand the caution. I think it's a good point. Let's assume we're applying plain error. Let's even assume you've got error, maybe even clear error. You begin, the jury was only out for 30 minutes. And the judge said, this is overwhelming evidence. And unlike Sands, it doesn't look to me like a he said, she said. Yes, that's why the defendant's testimony was so critical. But how do you get to substantial prejudice in a case where there's so much evidence, and it isn't a Sands situation of just pure credibility? There's another point of view as to why that jury was out 30 minutes, of course. They just listened to the judge and that was it? Well, and you have to really look at the court's comments specifically when he's testifying, because the heart and soul of this case is the airplane. Is the what? The airplane involved. There was an airplane purchased, and the government's theory is that Mr. Kirshner bought this airplane for himself. He took the money out of the Slinkbank account into his own accounts and bought the plane. The plane accounts for, in the wire fraud counts, we're talking 16 of the 20 million. Of the money laundering accounts, we're talking 19 of the 20 million. The only comment by the judge was, gee, I'm too, you know, I don't have enough money to get in planes like that. It was, right? Wasn't that his literal interjection? It was sort of sarcastic. You're in a high life and I'm, I'm, I'm judge, don't, don't, can't, isn't that what he said? No, sir. No, sir. No? It was more, there were three steps to this. Okay. Step number one was, uh, and you got to understand the defendant's testimony. It was, I bought this plane for the business and overwhelmingly it was used for the business. So it's under that context and I bought it due to COVID because of, I couldn't get the flight. So the first step in the court's questioning is, well, uh, let me get this straight. You bought this very expensive jet due to COVID and that's already problematic because in science it says we can't overemphasize testimony that didn't need clearing up. He had already testified to that on direct. It gets worse. Next he says, he asked him, well, couldn't you have gotten charter flights? I don't run in your circles. I'm not a sophisticated person. Now, fair enough. That's a good question. The defendant gives a response of, why do you say it's a good question? Judge isn't supposed to personalize the case to himself. Well, fair enough. But here's where it really gets bad, your honor. It really gets bad whenever he then makes a comment, not a question, a direct comment, $20 million should could buy a heck of a lot of charter flights. That's a signal to the jury. Don't believe him. Don't believe this defendant. It's at that point he crosses the line onto the playing field of the prosecution. And as this court says in a Chobie, we will not hesitate to find error when the trial judge forgets he's no longer at the council table, but it gets worse. There's more comments. There's more questions. There were, but there were a lot of questions the government's case as well. This is just a very enthusiastic district judge, a participant, but it doesn't necessarily show he was signaling whose side he was on. There is more questioning to the defendant. And I would respectfully disagree when we look at all of the questions to all of the witnesses. I think when you really parse out the record, you will see overwhelming majority of the time, if not all the time, it was to the government's benefit and the defendant's detriment. The leading question that was asked in the response given went against the defendant. But in addition, finally, but never an objection. Again, that's the court alluded to. It is a hard situation. I wasn't trial counsel, but I don't envy them. A tough, I guess three questions that come to my mind as significant doing the third and fourth prong of plain error, substantial prejudice and miscarriage. One would be, did the government capitalize in closing argument on any evidence that the district judge had listed it? Did you put that in your brief or do you know? Well, no. In closing argument, did the government capitalize on anything that any witness said solely in response to the judge's question? Mr. Kirchner's credibility. I know his credibility was called into question, but that was called in the question by the government extensively too. Yes, sir. Yes, sir. And that's part of their closing is he's lying. I know, but they had impeached him significantly. So a second question is, do you know, because there was such a litany of judicial interruptive questions, were any of the answers, um, not impermissible under the rules of evidence? In other words, did the district judge elicit evidence that wouldn't normally have been admitted had he not been asking the questions himself? Well, the prime example for that, well, first of all, his comments are not permissible. Well, I know that's your argument. I'm wondering in terms of prejudice, if the jury actually heard evidence that wouldn't otherwise have come in. Well, a prime example of that would be the testimony of Brian Yee, the venture capitalist. When the court gets into examples of underprivileged college kids and moms and pops retirements, he's getting into this exchange of Brian Yee asking him, well, who's really whose money is this at the end of the day down the trail? That's not relevant to show whether or not Mr. Kirchner made false statements and then obtained, converted the money for his own use as the jury charge requires to convict him. True, but, but those are, those are facts that would have come in. You know, the point, I guess the government was making is, um, you're not a Robin Hood. You're not just stealing from Goldman Sachs. You're stealing from military retirees, wasn't that? And the judge did enhance that. I agree, but wouldn't that have come in anyway? Respectfully, the government didn't make that point. Didn't make that point at all. The government, here's the government's question to Mr. Yee. And Mr. Yee, whose money is this? Is it your money? Well, it's my money and other people's money. And then the court jumps in and takes it to left field when he gets into the examples of Catholic charities, cures for cancer, underprivileged kids, none of which by the way, were a part of this case. And that's a serious problem. What he's doing is he's pitting. When you're saying, when you say not a part, they weren't in the indictment. They weren't in 404B offered. Exactly. None of that. Exactly. Yes, sir. And that's the problem. He's pitting the jury against the defendant. Did the government then capitalize on look at these victims in closing argument, Catholic charities missed out their money? Did the government actually capitalize on that evidence? This is exactly my question. It's the twin question. Did the government capitalize on answers only elicited by the judge, which the government hadn't gotten approval to offer as 404B? Well, in a way they did because a big part of the government's case was the lavish lifestyle of the defendant. Again, Main Street versus Wall Street, wealthy people versus, as the court phrased, not the prosecution, ordinary moms and pops, defendant versus jury. Wasn't, isn't that what the case was about in general? The lavish, lavish lifestyle that the government alleged was funded by corporate funds to the benefit, to the personal benefit. I don't know that we can discount that now by saying that the judge asked questions about something that wasn't, you just said that the plane was sort of the centerpiece of the case, probably the greatest indulgence. That would, that would have already come in anyway though, correct? Yes, sir. However, the court takes it to the next level when it makes up and creates Catholic charities and underprivileged kids and extreme, extreme examples. The court, the court's own words were, I know this is hyperbole. He's acknowledging these are extreme examples, but the damage has been done. You're, you're inflaming the jury. That's the ye testimony, correct? That's the ye testimony, correct? Yes, sir. Correct. Did it come up in any other, with any other witness, this type of questioning about charitable funds or retirement funds being taken advantage of? Similar, similar issue in the testimony of Tim Kehoe, the chief of staff, where he was asked, um, he, the court referred to him as his retired military rank. You missed a paycheck too, did you not, Colonel? Oh, yes, sir. And, and you were living off your military retirement. We're getting into victim impact statement. That's not relevant. Victim impact evidence. Uh, that's correct, Your Honor. Well, others weren't so lucky, were they? Again, others weren't so lucky. We're taking irrelevant information and we're inflaming it against the defendant is what's happening there. Now, again, to the defendant's testimony, if the jury, if the jury believed the defendant that that plane was for personal use, that is crippling to the government's case. When we're talking about substantial harm and we're talking about that third prong, that's a big deal. And you know what? And, and the government can impeach him and do they believe him? Who knows? But it's up to the jury. The jury should be able to decide who they believe. He's got the right to testify and not have the court express disbelief in his testimony. And my friend would say, well, this is a, this is, this doesn't matter. It's overwhelming. It matters. It certainly matters. What point remind me in the record, at what point did the judge give the, uh, prophylactic instruction about nothing I say or ask, uh, is to be considered evidence, uh, you know, that type of instruction. Certainly there was one at the end of trial. Was it ever given following one of these exchanges or comments on the record? In the jury charge, it is given, right? What's interesting is there's also kind of a confliction within the jury charge because the jury charge also says around page 693, 694, everything the lawyers say in this case is not evidence. Well, that means what he's saying does matter, but also the court in United States versus science as it was, was there an objection before you get onto that? Was there an objection or an attempt to include an additional encompass the judge's comments at the jury charge conference, something that would constitute an objection or something that was submitted that was rejected by the judge in terms of an instruction? No, sir, there was not, but I do want to draw the court's attention to United States versus signs were towards the end of the opinion. They say, Hey, in a case like this, you can't overcome that. You don't need an instruction. It's too much. Too much harm is done. And think of the line of questioning to the defendant and compare it to the line of questioning of signs. The court and signs told, ask the defendant about a co-defendant who had already testified and there was some discussion of loaning money to the co-defendant. The court says, well, um, let me get this straight. You didn't, you don't know where this person lives who you loaned $300 to and you haven't spoken with them since. The court said that was, that was an expression of disbelief. That was enough to have that case overturned. Let me ask you to, I think I probably cut off your answer, but you didn't answer the part about whether the judge gave any instruction during trial while the witness was testifying or at the conclusion of the witness's testimony that the judge might have said something and the jury's to disregard that, uh, it should not consider it as evidence. Was there any in trial instruction? No, sir. There was not. We are crystal clear on that. It was not until the final instruction to the court, to the jury before they deliberated. Thank you, counsel. You have time for a bottle. We'll hear from Miss Grant. Good morning. May it please the court. Amber Grant for the United States. In 2019, Christopher Kirchner sent an email to the employees of a fledgling company called Slink and the email warned them not to use company funds for personal expenses, chastising even the purchase of a cup of coffee with company funds. But just a few months, months later, in March of 2020, his viewpoint had apparently changed. Slink was infused with $5.7 million in cash after their series a stock offering. And within just one week, Kirchner used his authority as CEO to start to the operations account at Chase Bank, where he was the sole signatory. He continued these transfers, which were just under the $100,000 threshold that would trigger joint approval all the way until November of 2020. Chase account is a corporate account as well. It is. It is a legitimate operations account. He transferred $2.1 million into that account and he used it in a variety of ways. 18% was used for payroll and legitimate business expenses after it was moved to the Chase account. But 57% was transferred to his personal bank accounts where it was then used to fund his lifestyle. Let's say we don't see any merit to the sufficiency arguments. And I'm going to put aside the sentencing arguments with a little compliment to you because this district judge said at the end, no matter what, this is a broad sentence, but you didn't hide behind that catch-all. You went ahead and addressed the merits. So I'm very grateful that you did that. The government, I think, that's wise, not just to always win a judge. But the heavy focus was on the interjections by the district court, 614B, Sayings. So I'd like to start with standard of review. Cantu, Sayings, every single case to decide this issue has applied plain error. We had no objections to any of the court's questions, any of the court's statements. And it's entirely unfair to Monday Morning Quarterback this case and say that it somehow rendered this a constitutionally unfair trial. We did Monday Morning Quarterback in reverse and say yes. So it can happen. It can. But this court has repeatedly said Sayings is an outlier. It was a unique set of circumstances. You had a defendant testify where only one other witness, a cooperating co-conspirator, provided the evidence. There was no physical evidence. It was he said, she said, as Your Honor said. I agree. And that is a difficult, very fact-specific argument. But would the government, I mean, in your candor, would you agree that we're really on the third and fourth prong? Or would you somehow try to say there wasn't even clear error? Oh, I don't believe there was error at all. I think if you look, I think we have to say— But the test, you accept the test is, do the questions confuse the role of judge and advocate? Exactly. And you think there was no—okay, go ahead. I don't. I think there was cherry-picking. I think, as in Akobe, defense counsel has assiduously combed through the record. But how can a judge ever mock a criminal defendant? How can that ever be clarifying of facts as distinct from putting your finger on the scale? When we read that from a piece of paper, I think they're asking the court to read the mockery into it. But when the court was questioning Mr. Kirchner, first of all, he didn't say a word until the government came up on cross, okay? So Mr. Kirchner gave his entire exam on direct. He was able to get up there. He was able to give his entire version of it. I mean, if the judge jumps in to help the government, that's the worst. So he's not helping the government. He had a specific question. He said, you just got up here and you told your attorney you bought this airplane for COVID. What exactly was it about COVID? Was it, it's not safe to fly, there weren't any flights, you couldn't get there fast enough? What, how exactly did COVID... How is that just brilliant, incisive cross beyond what the prosecutor had done? I mean, that sounds like a prosecutor. Justify your COVID excuse. It's not justifying as much as it's clarifying. And several times during the court's questions, he opened with, this may help the jury. The court was clearly trying to get to the facts of the case. And you can see interjections throughout where the court is cutting off the government and saying, get to the point, you're taking too long, you're losing the jury. He's managing the tone and tempo of that trial throughout, not just with government witnesses, not just with Mr. Kirchner. He's aware that this is a complex case. It's a fraud trial. It lasted several days, right? We have complex terminology like gated liquidity and seed investors. And so the court is constantly interjecting to make sure that the jury understands those terms. You have a number of witnesses that get on the stand to testify to how the scheme worked and how their role as investors was impacted by Mr. Kirchner's conduct. I'd like to talk about the questions to Mr. Yee, because that was a large part of what was, what is being complained of on appeal. Mr. Yee was the third witness to testify about who was behind the investment funds. And those questions were always asked in the context of, why were you guys throwing good money after bad? Why did you keep investing even after the fraud was discovered? And so these witnesses were explaining, we had a fiduciary duty. This wasn't just money that was invested in the company on behalf of a business. We were representing . . . But the theory of the defense also was these victims were inattentive. And then you remember the judge jumps in and blows that up, right, inattentive to the financials? No. The theory was, I mean, Kirchner admitted on the stand to doctoring the financials. It wasn't inattention. This was just straight-up fabrication. They did due diligence. There's a data room, there are financials, but they were all fabricated and doctored. And Kirchner got on the stand and admitted that he doctored those documents. So it wasn't inattention of the investors inasmuch as I believe the court was simply trying to help the jury understand, why did you keep investing even after you knew that a fraud had occurred? What is possibly clarifying as opposed to helping the government when you interrupt to say, ladies and gentlemen of the jury, it's not just Goldman Sachs that's been victimized. It's military people. It's Catholic charities. I think he's helping the jury understand how investment funds work and why they would keep investing. I mean, it's a good argument, but jeez, when you draw out very, very vulnerable victims instead of Goldman Sachs and that's the judge? Even if we go with that, we have to look at both qualitative and quantitative, the qualitative and quantitative nature of the interruptions. In signs, the court said the statistics, excuse me, are important. And there the court's question and answers were almost 20 percent of the trial testimony. We don't even come close to that in this case. The questions complained about in regards to Mr. Kehoe and Samar Kamdar are less than 1 percent of their testimony. His commentary with Mr. Kirchner is 4 percent of his testimony. And even the extended colloquy with Brian Yee was 11 percent of the entire range of testimony there. So we don't have anywhere near the quantitative amount of questioning that you saw in signs. Qualitatively, even if we dispute over whether those matters had already been introduced by other witnesses, already brought into the trial by the government, already addressed by the defense, you still have to get over the third and fourth prongs, as Your Honor mentioned. And here the evidence was just overwhelming. This wasn't he said, she said. This was witness after witness testifying that they had- Did you say earlier Kirchner essentially admitted to the crime? He did. And was that the government's argument in closing? It was. The government never cited to who was behind the investment funds. The government never cited to who missed payroll. The government never cited to Samar Kamdar asking for sports tickets more than- The government's in a tough spot because they can't really object to the government, but they don't want to go down the routes that the courts opened up. They didn't bring it up in closing. They didn't bring it up in closing because it wasn't crucial to proving the elements of the offenses here. Not only did you have all of the direct testimony about the fraud, but then Kirchner took the stand and admitted to fabricating documents, creating false wire transfers. He admitted that he transferred money from the business account to his personal lifestyle. All of those admissions together made it extremely easy for the jurors to- There was probably a Rule 20. I'm sorry. Go ahead. I was going to say, but doesn't that counsel argue that his credibility as to benefits to the corporation sounds like that was his line of defense? Yes, they did all these things, but nonetheless, they all inured to the benefit of the corporation. So aren't we back on the territory of credibility at that point? So the questions to Brian He about who was behind the investment funds would have no bearing on credibility. Same with the questions to Kehoe and Kamdar. We'd have to only look at the questions to Kirchner during his exam. Those questions were aimed at explain to me why COVID is your reasoning and explain to me why you bought a plane instead of chartering flights. He said, look, I talked to an expert. I had a guy. The guy told me if I need more than 80 chartered flights in a year, it's better to buy the plane so that I have it as an asset and I'm not just throwing money after a rented plane. And it gave him an opportunity to actually increase his credibility to the jury. It opened the door for him to say, I relied on other people telling me that this was a smart financial decision to buy the plane instead of to take these chartered flights. And so it didn't negatively impact his credibility as much as it allowed him to further elucidate on his reasons for calling this a business expense. The jury just didn't buy it. The jury looked at the flight logs. There was testimony from one of his golf buddies that every time he flew on the plane, it was for personal trips, never for business. They had no business relationship. Testimony from KPMG that every time he took a flight on the plane, it was never for business. It was always for personal golf trips. So the jury heard him try to justify that as business and just didn't buy his version of events. Two fact questions, one legal question. Factually, opposing counsel said there may have been non-404b victim evidence that was introduced only in response to the judge's question, specifically the Catholic Charities. Would you agree that the government hadn't offered the Catholic Charities as a victim, either in the charge or in 404b, the only time it comes up is when the judge brings it up? Is that correct? That's the only time it comes up. It came up anecdotally. So the court is saying, just give me some examples. And he specifically says, not in this case, not in this case, but just tell me typically, who do you guys, okay, you've got university endowments. Mr. Court clearly said it. I'm not talking about the Catholic Charities being victimized here. Right. He's, what does a university endowment mean? What is a pension fund? Second question, factually, whether there was a curative instruction that explicitly said to the jury, whatever I say, like what the lawyers say, isn't something you should take into account unless it's about the law. Did he give that instruction? Can you read it to us? And those are at ROA 2419, ROA 2649, and ROA 2650. Each time referring to himself and lawyers? Just to himself. Don't take anything I say or do. He peppered that throughout the trial? Say that again? He did pepper that in throughout the trial? Yes. Well, beginning and end. Book ended it with, don't take anything I say or do. Was that in Sands? Do you know whether there was a curative instruction? I don't know. Probably. It's a patterned instruction. I don't know if they got there because they spent so much time talking about how important in the he said, she said scenario, how important it was to have the judge interjecting up to 20% of the trial as they jockeyed back and forth on whose version of events to believe. A legal question is, is there daylight between the fourth prong and the third prong, or would we be deciding that if we think there's clear error, is it all about whether he was prejudiced? Could there be an, okay, he was prejudiced, but it's not a miscarriage? Could that even exist here? Do you agree with me? It's pretty much the third prong. There's daylight. I don't know that it's a lot of daylight. I think the court is pretty consistent in requiring those prongs to be argued separately. In this case where he would have to show that a different trial would result for his substantial rights to be affected, it would be difficult for the court to say, you would have been acquitted, but we're not going to revisit this under the fourth prong. Okay. So I do think we have to assess those separately, but I'm not sure that it's a tremendous amount of daylight in a case like this where you're talking about the result of the jury verdict. Thank you. If the court would like me to address the sufficiency of the evidence, I'm happy to, but otherwise I would rely on the government's brief and ask the court to affirm both the convictions and the sentence in all respects. Thank you, Counsel. Thank you. Yes, thank you, sir. I would agree with counsel in that this case is not analogous to Sines. It's worse. She didn't quite say that. It's worse, Your Honor. Also, in Sines, when you look to the end of the opinion, the district court twice instructed the jury, gave that same inoculating instruction that's in this case. You'll see in the Sines opinion. Now, the reason why it's worse, during Brian Yee's testimony, as the court is explaining moms and pops and Catholic charities and cures for cancer, he says, by the way, jury, I was a member of the SEC, and what I learned at the SEC was that you have to have over a million dollars to invest into these funds. You have to have that, and that's how this works. The SEC, as the government stated in their opening statement, that's who originally investigated the case, and as their agent, as the FBI agent Sarah Israel testified to, that's who got the ball rolling in this case. He's saying he was once a part of that entity. Also, the court did not go out of its way to say Catholic charities weren't involved in this case. The line is blurred. When you look at the specific quotes in the brief, and we put the quotes in there, directly in the brief, to shortcut it here. He says, so when you have an investment like Catholic charities, and then the court asks for a specific example, and Mr. Yee gives New Mexico State. He says there's a company called Cambridge and Associates who manages college funds. One such university is New Mexico State. The court says, okay, good. Let's say New Mexico State has a Corps of Cadets program. That funds that, right? Let's say New Mexico State's finding a cure for cancer. That would help for that, right? That's where the line gets blurred from this case to not this case. That's why that could be confusing. Regarding the defendant's testimony, one thing that's left out, when we're talking about the believability of the defendant and his testimony about buying it under his name so the company doesn't have liability if the claim went down, when the court, after the court said, well, I learned in law school that it's better to have it the other way for you not to be personally sued, for the corporation to have the asset, the court then makes a direct comment, this is not a question, I would a heck of a lot rather my company get sued than me individually, because I don't know, I'd like to make sure I have my assets and nobody comes and gets grandma's jewelry to pay for a judgment. Direct signal to the jury. This is a direct comment on his believability. And my friend does point out, Mr. Kirchner, when he's on the stand, he's being frank and he admits to doctoring some bank records, that's not enough to convict him per the jury charge. If you look at page 705 of the record, it says there has to be material false statements provided and he would have to convert that money for his own use, and that's in the essential element number one where Judge Pittman instructs the jury, you must, to find him guilty beyond a reasonable doubt, you have to find that. So that's not enough. His credibility was crucial here. If he's admitting to the fraudulent intent, what did the district judge here ask that went to the deprivation of property element? The criminal intent was an issue in that . . . I know, but you were just saying, when Kirchner gets on the stand, he virtually confesses to the doctoring. So the false statement, which is material, aren't we then just looking at, as you said, where'd the money go? But that's not something that I thought this district judge really doubted. Didn't Kirchner benefit? Is there any doubt, just in terms of the exhibit evidence? No, sir, because he is doubting his testimony as to whether or not that's the truth. He's calling into question whether or not he's using it for himself. The whole, Kirchner's whole point is, I'm using it for the company. I'm not converting for my own use. And Judge Pittman is waving to the jury and says, don't believe him. He's not believable. What I, go, Judge Pittman says, what I learned in law school is that you don't want to be personally liable. You want the corporation to be liable. So hang on, jury, don't believe that. And that's the whole basis of the defense there. And he's crippling the defense. He's eviscerating it with that comment. Both of you are very, very capable lawyers. Can you, have you spotted another plain error case in any other circuit where there was a reversal, like in Sands? Are there any others, or are we just looking at Sands? Yes, sir. No, sir. In the First Circuit. The First Circuit is helpful here because this issue doesn't come off that often. This is in your brief? Yes, sir. Raymondi Hernandez. Oh, yeah. I remember that. Okay. And Raymondi Hernandez, they say there is danger. There's plain error when the judge cross-examines the defendant. And when they say cross-examine, they're talking about leading bias questions. It creates a tag-team situation in which the court gives the jury a powerful and impermissible impression that the district court agreed with the government and the defendant was guilty.  Thank you so much, sir.  No, no, no. That's great. Thank you both. Yes, sir.